| t DREW, J.
Terri Robertson, euratrix and granddaughter of Fay Medley, filed suit to set aside a 1992 donation of immovable property made by Fay Medley to Bill Medley, her husband of nearly 30 years. Robertson alleged that Fay Medley, who was interdicted in 1996, lacked the capacity to donate the property because she was suffering from Alzheimer’s Disease at the time. The trial court disagreed, finding that Robertson failed to prove by clear and convincing evidence that Fay Medley lacked capacity when executing the donation. Robertson now appeals this adverse judgment.
We affirm.

FACTS

On April 8, 1992, Fay Medley (“Fay”) donated to Bill Medley (“Bill”) an undivided one-half interest in immovable property located in Union Parish that belonged to her separate property. Fay, born on March 17, 1919, was 73 years old at the time. The donation deed reflects that the interests of Fay and Bill in the immovable property would become community property and form part of the community of acquets and gains. Bill died in February 1996, having been married to Fay for nearly three decades.
Fay was interdicted on April 30, 1996. Terri Robertson, as euratrix, filed a petition to set aside the donation on September 27, 1996. Named as defendants were Bill’s two daughters, Judy Flinn and Linda Cubine. Robertson amended her petition on April 3, 1997 to add the Succession of Bill Medley as a defendant.
*932 Trial was held in this matter on November 13, 1997. The trial court provided detailed reasons for judgment styled as an “Opinion.” While the trial court recognized that Fay suffered from Alzheimer’s when she executed the donation at issue, the court ultimately concluded that Robertson failed to meet her burden of proving by clear and convincing evidence that Fay lacked the mental | ¡¡capacity to execute the donation. Robertson now complains that the trial court erred in reaching this finding.

DISCUSSION

The capacity to donate inter vivos must exist at the time the donor makes the donation. La. C.C. art. 1471. In order to have capacity to make an inter vivos donation, the donor must be able to comprehend generally the nature and consequences of the disposition that he is making. La. C.C. art. 1477. The burden of proving Fay’s lack of capacity is a heavy one for Robertson. La. C.C. art. 1482 provides that a person challenging the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation. Proving a matter by “clear and convincing evidence” requires establishing that the existence of a disputed fact is highly probable, that is, much more probable than its non-existence. Succession of Bilyeu, 28,701 (La. App.2d Cir.9/25/96), 681 So.2d 56, unit denied, 96-2868 (La.1/24/97), 686 So.2d 862.
The issue of capacity is a question of fact. The trial court’s factual findings will not be disturbed on appeal unless clearly wrong or manifestly erroneous. Succession of Dodson, 27,969 (La.App.2d Cir.2/28/96), 669 So.2d 642.
Terri Robertson, who brought the instant action, is Fay’s granddaughter. She described her grandmother as once being meticulous in appearance, interested in exercise and nutrition and concerned about others. Peggy Warner, Robertson’s mother and Fay’s daughter, died in 1987. Robertson testified that after her mother’s death, Fay stopped visiting her, causing Robertson to feel as if she no longer existed in Fay’s eyes. In order to communicate with her grandmother, Robertson now had to visit Fay, call or write her a letter. We note that Robertson lived in Abbeville while Fay lived in West Monroe. At the time of trial, Fay was bedridden and had been living in Robertson’s home for close to two years. Fay was moved there after Bill’s death in 1996.
| .-¡Robertson related that by 1990 or 1991, Fay did not recognize her, seemed disinterested in her and never called her by name. According to Robertson, she was unable to have a conversation with Fay because Fay would start to say something and it would not make any sense. All Robertson could do was sit with her grandmother and hold her hand.
Robertson saw Fay in February 1992 for the funeral of Cora Malone, Fay’s mother. She reported that Fay was unkempt in appearance, had trouble walking, was withdrawn, did not know who Robertson was and would smile and repeat herself. Robertson found it difficult to have a conversation with Fay at this time because she would stop speaking in the middle of a sentence. Robertson believed that Fay did not realize Cora Malone was dead because she continued to ask about Cora.
Robertson also testified that around 1989, Fay began calling her sister Toni “Puddin,” a pet name Fay used to call Robertson’s mother. However, this is not peculiar since Robertson’s husband and father both testified that Toni resembles her late mother. Robertson admitted that she did not see her grandmother very often prior to Bill’s death in 1996. The last time she saw Fay prior to this was in February 1992. She did not speak with Fay by telephone during this period.
Several friends, neighbors and relatives of Fay also testified. The trial court noted that these witnesses saw Fay infrequently during the years and months leading up to *933 the date of the donation. Emily Powell lived across the street from the Medleys. Powell testified that she was not around Fay too often because Fay was not the type of neighbor who liked to visit. Powell stated that shortly before Cora Malone’s death in February 1992, Fay did not know what she was talking about or who Powell was. Powell also thought that around this time Fay seemed to have trouble recognizing neighbors, and after asking who neighbors were, she would ask again minutes later.
|4We note that this witness sometimes appeared to confuse Fay Medley with Cora Malone while testifying, as evidenced by the following exchange:
Q: All right. Did — you did try to talk to her?
A: Well, I’d go over once in a while until she got where she didn’t know me and that was about three years before she died to me.
Q: Before Cora died?
A: Yes. I didn’t go over the last year at all. I didn’t never see her on the hospital bed or anything like that.
Q: Didn’t see Cora on the hospital bed?
A: No. I didn’t see Faye.
Q: Faye. All right. You didn’t see Faye for a —
A: After they put her on the hospital bed.
Q: After they put Cora in the hospital?
A: I hadn’t seen in a good while. She went to the nursing home.
Q: That’s right. She did. And she was living with Mr. and Ms. Medley when she went to the nursing home?
A: Yes.
(R. p. 73) Our emphasis.
Syble Hayden, Fay’s first cousin, told the trial court that she would see Fay once or twice a week. Hayden testified that shortly before Cora Malone’s death in February 1992, Fay confused her with another cousin and told Hayden that every once in a while she was unable to remember things like she used to. According to Hayden, one moment Fay would know who Hayden was, but the next moment Fay would not. Fay would be rational at times, but during other times she would act like she did not know where she was. Hayden remembered that Fay once cared greatly about her personal appearance, but around the time Cora died, Fay did not seem to care how she looked. Hayden characterized Fay as “getting pretty bad” Iswhen Cora died in February 1992. Fay’s sitter testified that Fay did not get along with Hayden and would avoid talking to her on the phone.
Rita Kennedy, Fay’s distant cousin, testified that when Kennedy broke her hip in May 1991, she telephoned Fay, but Fay would not talk about the same things Kennedy was talking about. When Kennedy recovered from her broken hip a few months later, she visited Fay. Kennedy acknowledged that she saw Fay only once between the time she broke her hip and the time of Cora’s death, and this was the last time she saw Fay. Kennedy discovered that Fay was not acting the same during her visit. Kennedy pointed out that Fay asked Kennedy where she lived, got response, then asked the same question again seconds later. Kennedy also noticed at this time that Fay never called anyone by their name. Kennedy has not talked to Fay on the phone since this visit.
The court particularly noted the testimony of James Malone, who is a “double first cousin” of Fay. Malone began noticing around 1989 that Medley was becoming forgetful. In early 1990, he started visiting Fay more often because he was retired, usually staying with her for 45 minutes to an hour. Malone remembered Fay asking his wife the same question concerning her hair four times. He thought Fay’s condition had worsened on subsequent visits. Malone testified that in 1991, Fay would ask who he was and thought he was her late brother.
Despite allegedly recognizing problems with Medley’s mental condition as early as *934 1989, Malone nonetheless notarized a document dated May 12, 1994 (over two years after the donation complained of here) in which Fay is listed as a mortgagee. Malone described to the trial court how someone had to help Fay sign her name to this document. Malone admitted that Fay did not realize what she was doing, but he explained that he notarized the document “to help [the] family out.”
Helen Malone, James Malone’s wife, testified that she has known Fay for 49 years. She first noticed in 1989 how Fay would repeat questions and would not | ¿make any sense when talking. She remembered that around the time of Cora Malone’s death, Fay did not even recognize who she and her husband were. Helen Malone also remarked that Fay’s appearance began to change as Fay was no longer as neat as she once was.
John Robertson is Terri Robertson’s husband. He found it difficult to have a conversation with Fay as early as 1989. He testified that he visited Fay three times between 1989 and 1992. He described to the court how in late 1991, Fay offered him coffee but never made it, did nothing but smile, and paced around the house without really accomplishing anything. By 1991, Fay did not know who the Robertsons were.
Frank Warner is Terri Robertson’s father. He first noticed a slight change in Fay’s condition in 1988 or 1989, originating with Fay frequently asking him if he wanted a cup of coffee. Warner testified that Fay Medley had a dog named “Dusty,” who she mistakenly called “Joe,” which was the name of her dog that had died. Warner stated that Fay also had trouble remembering someone’s name when she would talk about them. Warner felt that Fay became less concerned about her appearance starting in 1990.
Dr. William Smith, who is board certified in internal medicine, testified by deposition. Dr. Smith examined Fay for the first time on July 30, 1992, when Bill brought her in for a general evaluation. Dr. Smith’s notes reflect that “[apparently [Fay] had had progressive dementia over several years.” Dr. Smith found Fay to be disoriented as to month, year and place, and he thought she was suffering from dementia. Fay was aware of her surroundings, and Dr. Smith recollected that Fay could carry on a conversation, but during the conversation he could tell she did not have command of current events and precise data. Dr. Smith described Fay as being very pleasant, and explained how she would look him in the eye and try to converse with him.
[7Pr. Smith remembered Fay as being very demented at some point, but he could not remember whether he reached this conclusion during her first visit or a later visit. Dr. Smith testified that Fay met the criteria for an Alzheimer’s type dementia, which meant that there was no basis for her dementia other than Alzheimer’s. Based upon the report that she had progressive dementia, Dr. Smith would say that Fay had been suffering from dementia for at least six months prior to the July 1992 visit.
Dr. Smith did not perform any psychological testing or psychiatric evaluation of Fay. He acknowledged that Alzheimer’s has different stages, and he stated he cannot predict which symptoms will occur or how rapidly the disease will progress in a particular person.
Dr. Smith’s examination did not take place until three months after the donation in controversy. While Dr. Smith also testified that for a “short time prior thereto” Fay was suffering from dementia to the extent she was disoriented as to date, time and place, he did not specify how long he meant by a “short time prior thereto.” The trial court correctly observed that Dr. Smith did not opine about whether Fay would have been able to understand the nature of the donation or appreciate its effects on April 8,1992.
Patricia (“Pat”) and Donald Shipley first met the Medleys when they moved next *935 door to them in 1988. The Shipleys moved to Iowa in 1990, but returned to West Monroe in early 1991. In January 1992, Pat began sitting with Fay, but not because anything was wrong with Fay. Bill wanted Pat to sit with Fay because he wanted Fay to have company and he needed to be able to tend to his properties. Fay was also lonely and wanted someone to be with her, since her mother was in a nursing home and Fay liked to have someone to talk to. Don related how Bill wanted Pat to sit with Fay because he was worried she would fall, not because Bill was concerned about his wife wandering off.
|RPat and Fay would watch soap operas together and would discuss what they had seen. If Pat missed an episode, Fay would tell her what she missed. Pat believed that Fay knew what was happening during the soap operas. Pat recollected that Fay was able to hold a conversation in 1992.
Pat described how she and her husband went on a trip with the Medleys to Tennes: see in July 1992 for a Medley family reunion. Fay was able to pack their clothes for the trip. Fay also named some of Bill’s brothers she hoped to see during the trip. Pat recalled that Fay was fine during the trip, recognizing and talking to everyone.
Pat related how Fay selected and put on her own clothes and was able to use the bathroom by herself. She described how the Medleys were always teasing each other. For example, Fay would often hide things such as keys and shoes from Bill in a game of hide and seek. Pat testified that when certain people would call, Fay would tell Pat she did not want to talk to them. She remembered how Fay and Bill “had no use for Frank Warner.” Bill did not even want Frank Warner in his house. Pat also testified that Fay and Syble Hayden did not get along, and that Fay did not even want to talk to Hayden when -she called.
Many witnesses testified how Fay did not go to the funeral of her mother, Cora Malone. Pat explained that Fay did not go to Cora’s funeral because she wanted to remember her mother as she was before she died. Fay would occasionally ask Pat about her mother after she died. Fay would ask if her mother was in a “better place than she was at the nursing home.” Pat would tell Fay that her mother is not hurting, and Fay would respond that that was good and that her mother was now with Peggy, her predeceased daughter. An obvious inference is that Fay was discussing “where” her mother was in the context of the afterlife.
Pat would sit with Fay sometimes every other day, or sometimes just once a week. Pat did this for about one year. How long she stayed with Fay on a | particular day ranged from a few hours to all day. Pat did not observe anything unusual about Fay’s behavior, nor did she observe Fay acting confused or not thinking clearly.
Don Shipley (“Don”) saw the Medleys on a regular basis in 1992, usually everyday. Don felt that in 1992, Fay was able to converse with others, express her likes and dislikes, feed herself, dress herself, and use the bathroom by herself. When asked about the trip to Tennessee, Don told the court that Fay was aware she was going to see family and friends. The only behavior he observed in 1992 that he thought was unusual was how Fay would hide keys and how she would open a can of Vienna sausages, eat some of them, then return the remainder to the cupboard. He also remembered how once at a restaurant in Alabama, Fay wanted to help clean the table like she did at home. However, Don explained that Fay realized she was in a restaurant, but was just acting like she did when she was at home.
Don testified that Fay never knew his name and would call him “Joe.” He also stated that Medley called her husband “Joe.” Don remembered that the only times he ever heard Fay call Bill by his correct name was when she was mad at him. Pat corroborated this, testifying that *936 Fay knew who Bill was, but still never called him by his proper name. Don did not have any doubt that Fay knew in 1992 who her husband was. Don also observed Fay reading the newspaper.
Bruce Hampton is the attorney who notarized the 1992 donation. Hampton saw Fay twice in April 1992. Hampton had previously prepared Cora Malone’s succession papers in accordance with Bill’s instructions. The nature of the donation was discussed before it was drafted, when both Bill and Fay were present. While Fay was present when they discussed the donation deed, Hampton remembered Bill doing most of the talking. Fay never really contributed anything other than she indicated Hampton should go forward with it.
| inHampton went over the donation deed with Fay and told her what the donation would accomplish. Fay did not say much after he explained the donation, but only responded that she understood and wanted to sign. Most of her responses were yes or no answers. He did not observe Fay engage in any abnormal behavior, nor did he see anything which would indicate to him that Fay had any sort of mental condition.
Fay told Hampton that she understood that what she was doing would mean Bill would own half the property. When Hampton told her that Bill would get one-half of the property if he filed for divorce the next day, Fay responded that she was not worried about that happening. Fay affirmatively indicated she understood that she was making community property out of her separate property.
To the best of Hampton’s knowledge, Fay indicated that she understood what she was doing. Hampton heard Fay and Bill discussing the different names that they had for the same house on a particular piece of property, leading Hampton to believe that Fay knew what was going on. Whenever he asked Fay if she understood something, she responded “yes.” We note that Hampton notarized a credit deed for Fay in May 1994.

CONCLUSION

Based on our review of this record, we conclude that the trial court was not clearly wrong in finding that Robertson failed to prove by clear and convincing evidence that Fay Medley lacked the capacity to donate immovable property to her husband.

DECREE

At appellant’s costs, the judgment is AFFIRMED.